

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
10/27/2017

| | | |
|---|---|---|
| IN RE: § | | |
| ROTARY DRILLING TOOLS USA, LLC, § | CASE NO: 16-33433 | |
| *et al* § | | |
|     Debtor(s) § | | |
| § | CHAPTER 11 | |
| § | | |
| **FUQUA CONSTRUCTION** § | | |
|     Plaintiff(s) § | | |
| § | | |
| VS. § | ADVERSARY NO. 16-3203 | |
| § | | |
| PNC BANK, N.A. § | | |
|     Defendant(s) § | | |

## MEMORANDUM OPINION

Fuqua Construction Company filed a motion for partial summary judgment seeking to determine the validity and priority of its mechanic's and constitutional liens for work performed while constructing a building for Rotary Drilling Tools. Fuqua's motion for partial summary judgment is denied.

## Background

Rotary Drilling Tools manufactures and supplies the oil and gas industry with piping and drilling materials. (ECF No. 34 at 2). On July 6, 2016, Rotary Drilling filed for chapter 11 bankruptcy after falling oil prices led to a decline in demand for its products. (ECF No. 34 at 2). One of the main assets in the bankruptcy proceeding is the $2 million, 114 acre tract of land and associated buildings located in Fort Bend County, Texas, which house Rotary Drilling's operation. (*See* Case No. 16-33433, ECF No. 131 at 11). Rotary Drilling's bankruptcy led to this adversary suit between two of its creditors, Fuqua Construction Company and PNC Bank, which both claim an interest in Rotary Drilling's property.

*Fuqua Construction's Interest*

Beginning in 2007, Fuqua and Rotary Drilling began a successful working relationship with Fuqua constructing multiple buildings that Rotary Drilling required for its daily operations. (ECF No. 29 at 2–3). In August 2013, Rotary Drilling began negotiations with Fuqua to erect a structure on its property to house a Hansclever Upsetter machine that Rotary used in its manufacturing process. (ECF No. 29 at 3). Negotiations between the two parties concluded in July 2014 and the terms of the deal described 44 items of work that Fuqua would perform in exchange for a price of $2,005,376.71. (ECF No. 29 at 4). Fuqua began ordering materials to construct Rotary's new building on July 11, 2014, and provided invoices to Rotary Drilling that separated the agreed price into four equal monthly installments. (ECF No. 29 at 7). On November 14, 2014, Rotary Drilling signed a purchase order that memorialized both the scope of work Fuqua would perform and the price Rotary Drilling would pay. (ECF No. 29 at 7).

Although the contract between the two parties was not finalized, Fuqua claims it began work on the project on October 9, 2014, when it excavated and laid the foundation for the building. (ECF No. 29 at 7). Work progressed on the project until April 2015 when the Hansclever Upsetter unit was delivered to the site. (ECF No. 29 at 10). Along with complications in obtaining permanent electricity for the unit, the machine's installation, startup, and testing led to a halt in construction. (ECF No. 29 at 10). Fuqua claims that, during this delay, it remained in contact with Rotary Drilling's management and was under the impression that work would continue on the project once the Hansclever Upsetter was fully installed. (ECF No. 29 at 11).

As the price of oil dropped in 2015, Rotary Drilling began to struggle with repaying its debts. (ECF No. 34 at 3). After Rotary Drilling failed to pay Fuqua for its work on the

Hansclever Upsetter building, Fuqua filed an affidavit in Fort Bend County, which was recorded on April 15, 2016, claiming both a mechanic's lien and a constitutional lien against Rotary Drilling's property. (ECF No. 29 at 14). Fuqua now seeks to recover the unpaid debt owed to it by Rotary Drilling for its construction services in the amount of $384,477.55 through the liens it claims to hold on the Hansclever Upsetter building. (ECF No. 1 at 9).

*PNC Bank's Interest*

While Fuqua and Rotary Drilling were negotiating the Hansclever Upsetter project in late 2014, Rotary Drilling also engaged in talks with PNC Bank to establish a revolving line of credit. (ECF No. 34 at 3). PNC and Rotary Drilling finalized the terms for the revolver on March 25, 2015, and filed a deed of trust, security agreement, financing statement, fixture filing, and assignment of leases in Fort Bend County, Texas, where Rotary Drilling is located. (ECF No. 34 at 3). In exchange for the loan, Rotary Drilling gave PNC a security interest in Rotary Drilling's land, as well as present and after-acquired buildings and fixtures on that land. (ECF No. 34, Ex. C at 32–33). The financing statement was recorded on March 26, 2015. (ECF No. 34-3 at 32).

*The Parties' Arguments*

Fuqua filed this motion for summary judgment seeking to establish its liens as superior to PNC's security interest. Fuqua argues that it has a valid mechanic's lien on the property because it was not fully compensated for its work on the Hansclever Upsetter building and the work was ongoing. (ECF No. 29 at 15–17). Fuqua alleges that its lien relates back to the time when Fuqua first began construction on the project in October 2014, giving it priority over PNC's security interest that was not recorded until 2015. (ECF No. 29 at 21). Furthermore, even if Fuqua cannot establish a statutory lien, it claims that it also has a valid constitutional lien on the property because PNC cannot claim shelter as a bona fide purchaser because they had actual

knowledge of Fuqua's construction on the property before it filed its security interest. (ECF No. 29 at 18).

PNC counters, claiming in large part that the evidence Fuqua relies on is false. (ECF No. 34 at 5–11). PNC also argues that Fuqua's liens could not be valid because the project was abandoned in 2015 and its affidavit was filed outside of the statutory period. (ECF No. 34 at 12–16). Finally, PNC asserts that a constitutional lien cannot exist. (ECF No. 34 at 20–21).

## Jurisdiction

The district court has original jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O). It has been referred to this Court by General Order 2012-6.

## Summary Judgment Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056 (incorporating the Rule 56 standard into adversary proceedings). Disputes regarding material facts are genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 248 (1986). In order to support or refute an assertion that a genuine issue of material fact exists, the parties must cite to particular parts of the record to demonstrate that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The Court views the facts and evidence in the light most favorable to the nonmoving party at all times. *City & Cty. of S.F. v. Sheehan*, 135 S.Ct. 1765, 1769 (2015). Although all evidence in the records is considered, the Court refrains from making credibility determinations and weighing the evidence. *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, a party may object that evidence cited in the record cannot be produced as admissible evidence. FED. R. CIV. P. 56(c)(2).

The evidentiary support needed to meet the initial summary judgment burden depends on whether the moving party bears the ultimate burden of proof at trial. If the moving party bears the burden of proof on an issue, they must present adequate evidence to entitle the moving party to judgment at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). If the moving party establishes this evidence, the burden then shifts to the nonmoving party to cite to specific evidence that a genuine issue of material fact exists. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also articulate the manner in which that evidence supports that party's claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact. *Duffie v. U.S.*, 600 F.3d 362, 371 (5th Cir. 2010).

## Analysis

### *Statutory Mechanic's Lien*

To obtain a summary judgment award, Fuqua must first establish that there is no genuine issue of material fact regarding the existence of its lien. The Texas Property Code provides a lien to persons who provide materials and labor for the construction of a building. TEX. PROP. CODE ANN. § 53.021(a)(1)(A) (West 2017). This statutory lien secures payment for both labor and materials provided during a building's construction. § 53.023. In order to perfect the lien, "the person claiming the lien must file an affidavit with the county clerk in which the property is located . . . no later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues." § 53.052(a). Indebtedness accrues on the last day of the month after the work required in the original contract is completed, settled, or abandoned, or the party to a

Case 16-03203 Document 39 Filed in TXSB on 10/27/17 Page 6 of 17

contract receives a written declaration from the contractor stating that the original contract has been terminated. § 53.053(1), (2). Texas courts liberally construe mechanic's lien statutes "for the purpose of protecting laborers and materialmen." *Hayek v. W. Steel Co.*, 478 S.W.2d 786, 795 (Tex. 1972).

There is no dispute between the parties that Fuqua provided labor and materials for the construction of Rotary Drilling's Hansclever Upsetter building. (ECF No. 29 at 3–7; ECF No. 34 at 2). Also, Fuqua properly filed an affidavit claiming a statutory lien on the property in Fort Bend County on April 15, 2016. Accordingly, the dispute between the parties is focused on whether Fuqua perfected its lien by the end of the statutory window. The statue requires that the lien is claimed no later than the 15th day four months after indebtedness accrues which is defined as the completion, termination, settlement, or abandonment of work. *See* TEX. PROP. CODE ANN. §§ 53.052(a), 53.053(1), (2). Thus, Fuqua must have accrued indebtedness after November 2015 in order for its lien to be properly perfected. Fuqua claims that it continued to perform work in both December 2015, and January 2016, entitling it to a perfected statutory mechanic's lien. Accordingly, those are the only two months in dispute that affect the outcome of this portion of the decision.

*Fuqua's Summary Judgment Argument*

Fuqua claims that its work for Rotary Drilling was continuous throughout 2015 and did not end until January 2016. To support its summary judgment motion, Fuqua provided the affidavit of its executive manager, Gary Fuqua, who outlined the work Fuqua completed from August 2015 to January 2016. Fuqua delivered a BH-8 forklift to the construction site and also removed some shipping containers and rock from the work area in August 2015. (ECF No. 29-1 at 8). The affidavit also claims additional work was performed in December 2015 because the

installation of the Hansclever Upsetter machine required the modification of H and I beams before the mezzanine walls, ceiling, and deck could be properly installed. (ECF No. 29-1 at 8). Finally, in January 2016, Fuqua asserts that it cleaned, repacked, and placed overhead doors it had removed from the building in dry storage, intending to reinstall them later in its work. (ECF No. 29-1 at 8). Fuqua points to this fact as evidence that work on the project was continuous and not terminated, abandoned, completed, or settled until January 2016.

The first issue to consider is whether the work Fuqua claims to have performed in December 2015 and January 2016 satisfies the requirements for a statutory mechanic's lien. Although Fuqua claims to have performed work for the Hansclever Upsetter building during this time, the alleged work all occurred off site in Fuqua's Navasota shop and consisted of modifying beams and storing the overhead garage doors. (ECF No. 29-1 at 8–9). Although the work did not take place at Rotary Drilling's job site, Texas courts have allowed statutory liens to cover offsite materials as long as they were within the scope of the original contract. *See Addison Urban Dev. Partners v. Alan Ritchey Materials Co.*, 437 S.W.3d 597, 599–600 (Tex. App.—Dallas 2014, no pet.) (approving a statutory lien for a contractor who supplied sand for concrete even though concrete was mixed off site and not all of the delivered materials were incorporated into a final paving project).

In its affidavit, Fuqua claims that the modifications performed in December 2015 were required "because the final layout . . . in the Upsetter Building could not be determined until after the Hansclever was installed." (ECF No. 29-1 at 8). The goal of the contract was to construct a building to house a Hansclever Upsetter machine, and the modifications made in December were done to accommodate the newly installed machinery. (ECF No. 29-1 at 3). Thus, even though

the work Fuqua performed in December 2015 was performed offsite, it remains within the scope of the original contract and covered under a valid lien.

Second, to have a valid lien, Fuqua must show that it perfected its lien within the statutory period. Under the statute, an affidavit must be filed on the fifteenth day of the fourth month after indebtedness accrues. The clock for perfecting a statutory mechanic's lien begins after indebtedness accrues on the occurrence of one of four events: the completion, termination, final settlement, or abandonment of work by an original contractor. § 53.053(1), (2). Completion under the statute requires actual completion of the work contemplated in the original contract. *Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720, 725 (Tex. 2003). It is clear that the work on the Hansclever Upsetter building was not complete as of January 2016 because significant structural work remained to be performed on the walls and decks of the building before the scope of the original contract was fulfilled. (ECF No. 29-1 at 7). Additionally, the affidavit claims that Fuqua performed some work for the building that was within the scope of the contract between August and December, suggesting that termination, settlement, or abandonment had not occurred. (ECF No. 29-1 at 7–8). If the Court accepts Fuqua's timeline, it follows that the affidavit filed on April 15, 2016, in Fort Bend County was timely to perfect its statutory lien. *See L&N Consultants, Inc. v. Sikes*, 648 S.W.2d at 368, 372 (Tex. Civ. App.—Dallas 1983, writ ref'd n.r.e.) (holding that an affidavit filed before indebtedness accrued may secure a statutory lien). Accordingly, Fuqua satisfied its initial burden of demonstrating that evidence in the record entitles it to a statutory mechanic's lien if the evidence provided in the affidavit is true.

*PNC's Summary Judgment Argument*

The burden next shifts to PNC to provide evidence that a genuine issue of material fact exists regarding this evidence. PNC relies on two main arguments to demonstrate that a fact issue exists regarding Fuqua's evidence: the material contained in Gary Fuqua's affidavit is false; and Fuqua abandoned its work for Rotary Drilling before December 2016, rendering its statutory lien ineffective. (*See generally* ECF No. 34).

PNC first attempts to demonstrate that the evidence Fuqua relies on is contradicted by testimony obtained during PNC's deposition of Gary Fuqua. During the deposition, PNC asked Gary Fuqua to describe the work Fuqua had performed on the building and how it led to the amounts Fuqua charged in its four sworn and notarized applications for payment. (ECF No. 34 at 5–8). Each time, Gary Fuqua was unable to account or describe the work performed. (*See* ECF No. 34-2). In PNC's view, this inability to explain the work performed renders these sworn statements false and impeaches Gary Fuqua, which in turn undermines the credibility of the affidavits he provided. PNC cites case law that it claims supports the idea that "when testimony is contradicted and impeached . . . genuine issues of material fact exist." (ECF No. 34 at 5).

However, the case law PNC relies on addresses a materially different situation inapplicable to this summary judgment motion. Specifically, PNC points to employment law cases where plaintiffs must establish that an employer's explanation for adverse action is mere pretext for retaliation. *See Gee v. Principi*, 289 F.3d 342, 347–48 (5th Cir. 2002); *see also Reeves* 530 U.S. 133 at 146–48. In *Gee*, The Fifth Circuit stated, "although [the employer] initially denied that he participated in a meeting relating to [the plaintiff's] position, [he] later admitted that he had attended such a meeting." 289 F.3d at 347–48. The discrepancy in the

testimony presented in *Gee* directly addressed an element of the cause of action, namely whether an employer's explanation was pretext for other purposes. *Id*.

On the other hand, PNC claims that Gary Fuqua's inability to describe the work done based on his applications for payment creates a genuine issue of material fact because "the Court cannot trust Fuqua's sworn statements." (ECF No. 34 at 8). Casting doubt on the credibility of evidence presented is a far different claim than introducing evidence on the record that an element of a claim was not satisfied. Unlike in *Gee*, where the employer's inconsistent statement directly addressed the issue of pretext, PNC's assertion at best questions the veracity of Fuqua's assertions and fails to directly contradict them with evidence. Additionally, PNC fails to address the notion that, under the summary judgment standard, the Court refrains from making credibility determinations and weighing the evidence. *Reeves*, 530 U.S. at 150. Accordingly, PNC's argument questioning the credibility of Fuqua's evidence fails to introduce a genuine issue of material fact.

Second, PNC claims that Fuqua accrued all indebtedness to it prior to December 2015 by abandoning its work and consequently failed to perfect its lien in accordance with the statute. (ECF No. 34 at 12). PNC presents affidavits from two Rotary Drilling employees both claiming that Rotary Drilling requested that Fuqua stop work on the Hansclever Upsetter building in early 2015 and that after April 2015, Fuqua did no work on the project. (*See* ECF No. 34-4; ECF No. 34-5). Bryan M. Gaston, who is Rotary Drilling's Chief Restructuring Officer, stated that after April 2015, no one from Fuqua signed Rotary Drilling's log book, which was required for all visitors who visited the property. (ECF No. 34-4 at 3). Additionally, Tige Egan, who was Rotary Drilling's Operations Manager during the time period in question, stated:

> 5. It is my understanding that in approximately January of 2015, [Rotary Drilling] requested Fuqua to stop its work on the second Upsetter Building as [Rotary Drilling] could no longer fund the project . . . .
>
> 9. I am not aware of any documents or records showing that Fuqua's employees or subcontractors accessed [Rotary Drilling's] property. [Rotary Drilling's] records do not show any visitors form or affiliated with Fuqua entering the Beasley Property after September of 2015.

(ECF No. 34-5 at 3).

Additionally, PNC claims that Fuqua's own internal documents support a finding that Fuqua abandoned its work on the project. (ECF No. 34 at 15). According to PNC, Fuqua's "Diary and Cost Code Notes and Indexes" reflect that the work performed from December 2015 through January 2016 amounted only to clean up and recovery of materials rather than actual work performed on the Hansclever Upsetter site. (ECF No. 34-2 at 66–69). Although Fuqua claims that this was done to modify materials for future installation, PNC argues that, in fact, "there was no additional work being done on the Upsetter Building or otherwise."

Although case law discussing abandonment is sparse, in *Lyda Swinerton Builders, Inc. v. Cathay Bank*, a Texas Court of Appeals addressed the issue in a case that closely parallels the current dispute between PNC and Fuqua. 409 S.W.3d 221, 237–40 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). A builder began construction work for a developer and in October 2008 the developer began falling behind on its payments. *Id* at 228. The builder filed a lien affidavit in January 2009 but remained on the property until March 2010 and continued accruing expenses. *Id*. Ultimately, a bank foreclosed on the property under a deed of trust, leading to cross motions for summary judgment regarding which party was entitled to priority. *Id*. The bank argued that the builder's January lien affidavit was ineffective because the builder had abandoned work in October 2007, well outside of the statutory window to perfect its lien. *Id*. at

237. The builder claimed that its continued presence on the job site through March 2010 proved that it had not abandoned work and effectively perfected its lien. *Id*. The court adopted the ordinary definition of abandon as "to turn from or relinquish" and held that a fact question existed based on the evidence both parties presented. *Id*. at 238. While the builder's continued presence on the jobsite for almost two-and-a-half years supported that it had not abandoned the jobsite, the fact that the builder "did no work, received little payment, sent notice of its intent to terminate the contract, and sued the developer" also supported the notion that it had abandoned the job. *Id*. Furthermore, although the builder's affidavits circumstantially suggested that the developer intended for the builder to resume work, the evidence presented failed to clearly establish what was promised and when those promises were made. *Id*. Thus, the equally plausible evidence presented from both parties created a genuine issue of material fact and neither party was entitled to summary judgment. *Id*.

The evidence presented between PNC and Fuqua creates an even closer question than the one discussed in *Lyda Swinerton Builders* because at no point did either party attempt to terminate the contract or file suit to recover money. On one hand, Fuqua claims that it timely filed its affidavit and suggests that it maintained a continuous presence on the job site, intended to resume work, and removed materials back to its shop for modification. On the other, PNC suggests that Fuqua had never reentered the jobsite after April 2015 and the activities Fuqua claimed to perform amounted only to clean up and removal of materials from the jobsite rather than actual work. Both parties present credible evidence, yet neither is determinative. Thus, PNC satisfied its burden of demonstrating that a genuine issue of material fact exists regarding whether Fuqua abandoned its work on the Hansclever Upsetter building before December 2015. Fuqua's motion for summary judgment regarding its statutory mechanic's lien is denied.

*Constitutional Lien*

Fuqua also claims that it satisfied the requirements entitling it to a constitutional lien that has priority over PNC's deed of trust because PNC had actual notice of Fuqua's interest. (ECF No. 29 at 18). The Texas Constitution provides a lien to builders "upon the buildings and articles made or repaired by them for the value of their labor done thereon . . . ." Tex. Const. art. XVI § 37. The party claiming a constitutional lien must be in direct privity of contract with the property owner. *Da-Col Paint Mfg. Co. v. Am. Indem. Co.*, 517 S.W.2d 270, 273 (Tex. 1974). A constitutional lien is "self-executing, and exists independently and apart from any legislative act." *See Strang v. Pray*, 35 S.W. 1054, 1056 (Tex. 1896); *also Rosen v. Peck*, 445 S.W.2d 241, 247 (Tex. Civ. App.—Waco 1969, no writ). Consequently, filing an affidavit or complying with any statute is not required to claim a constitutional lien. However, a constitutional lien holder may only enforce its lien against innocent purchasers who have either actual or constructive notice of the lien. *Tex. Wood Mill Cabinets, Inc. v. Butter*, 117 S.W.3d 98, 105 (Tex. App.—Tyler 2003, no pet.). Actual notice consists of personal information or knowledge while constructive notice is "imputed to a subsequent purchaser only where work is performed by the lien claimant at or after the date the purchaser takes possession of the property or where the purchaser knows the identity of the specific entity performing the work." *Id*. at 106. Although an affidavit is not required to *claim* a constitutional lien, an affidavit filed in compliance with the requirements for a statutory lien provides purchasers with *constructive notice* of a constitutional lien. *Detering Co. v. Green*, 989 S.W.2d 479, 481 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

*Fuqua's Summary Judgment Argument*

Fuqua claims that PNC had actual notice of its constitutional lien prior to funding its loan to Rotary Drilling and securing it with the corresponding deed of trust. (ECF No. 29 at 18). Fuqua's evidence consists of the deposition of a PNC account relations employee that Fuqua claims demonstrates PNC's actual knowledge of Fuqua's constitutional lien. (ECF No. 29 at 9). The employee stated that a third party performed an appraisal of the property for PNC, which specifically noted that Fuqua was in the process of building the Hansclever Upsetter building and that construction was not yet complete. (ECF No. 30-6 at 8, 18). Additionally, the deposition revealed that PNC itself set aside $500,000 in reserve until the building was complete and gradually lowered that amount to $128,600. (ECF No. 30-6 at 14). Because PNC had actual notice of the work performed on the Hansclever Upsetter building, Fuqua asserts that its constitutional lien has priority over PNC's deed of trust.

Actual notice of a lien requires that the subsequent party have personal information or knowledge of the lien holder's interest. *Butter*, 117 S.W.3d at 101 (holding that home purchaser had personal knowledge of cabinet maker's interest in property after viewing house during construction). Actual notice can also be inferred "when the purchaser had the means of knowledge and a reasonably diligent inquiry would have disclosed the full truth." *Apex Fin. Corp. v. Brown*, 7 S.W.3d 820, 831 (Tex. App.—Texarkana 1999, no pet.) (citing *Woodward v. Ortiz*, 237 S.W.2d 286, 289 (Tex. 1951)). The evidence Fuqua presented demonstrates that PNC had some knowledge of Fuqua's interest in constructing the Hansclever Upsetter Building. Prior to funding Rotary Drilling's loan and executing its deed of trust, PNC had a third party perform two appraisals of the property. (ECF No. 30-6 at 18–19). This appraisal included Fuqua's applications for payment and the balances remaining to be paid for the Hansclever Upsetter

building. (ECF No. 30-6 at 18–19). It is clear that this appraisal provided PNC with actual knowledge of Fuqua's interest in the incomplete project.

Fuqua provided adequate evidence to demonstrate that it is entitled to a valid constitutional lien and that PNC had actual notice of Fuqua's interest prior to establishing its security interest. The burden then shifts to PNC to show that genuine issue of material fact exists regarding the existence of Fuqua's constitutional lien and PNC's actual notice of the lien.

*PNC's Summary Judgment Argument*

In opposition, PNC first claims that Fuqua's constitutional lien theory is an unpled cause of action that is inappropriate to present in summary judgment. (ECF No. 34 at 17). In a lengthy footnote, PNC claims "Fuqua does not cite, invoke, or otherwise refer to the Texas Constitution or to a lien arising under such." (ECF No. 34 at 17 n. 80). Although it is true that courts have discretion not to consider unpled theories on summary judgment, that is not the case here. *BBC Merch. Sol., Inc. v. Jet Pay, LLC*, 129 F.Supp.3d 440, 458 (N.D. Tex. 2015). In its initial complaint, Fuqua stated in a footnote: "Fuqua also claims and is entitled to a *constitutional lien*, as provided for in Article 16, §37 of the Constitution of the State of Texas." (ECF No. 1 at 6 n. 2) (emphasis added). The goal of a complaint is to provide the parties fair notice of the claims and the grounds upon which it rests. *Ashcroft v. Iqbal*, 556 U.S. 662, 698–99 (2009). It is clear from its pleading that Fuqua intended to claim both a statutory and constitutional lien. While Fuqua did not delve into a lengthy explanation regarding its constitutional lien theory, it was stated in the pleadings and it is reasonable to assume it would be raised in subsequent proceedings. As a result, PNC's first argument opposing Fuqua's constitutional lien theory is denied.

Second, PNC argues that, in order to claim a constitutional lien, Fuqua must comply with the requirements to perfect a statutory lien outlined in the Texas Property Code. (ECF No. 34 at 17). PNC cites *McEvoy v. Ron Watkins, Inc.*, as support for the notion that "a lien claimant must comply with all lien preservation requirements set forth in Chapter 53 of the Texas Property Code in order to *perfect* an alleged constitutional lien. . . ." (ECF No. 34 at 18). As stated, this is a misinterpretation of well settled Texas law—constitutional liens are self-executing and no subsequent actions are required on the part of a lien claimant to assert them. *Strang v. Pray*, 35 S.W. 1054, 1056 (Tex. 1896); *Rosen v. Peck*, 445 S.W.2d 241, 247 (Tex. Civ. App.—Waco 1969, no writ).

However, PNC presents another wrinkle to this argument, claiming that, under 11 U.S.C. § 544(a), a debtor in possession—imbued with the trustee's strong arm power as a hypothetical lien creditor—may avoid the same obligations as a bona fide purchaser of real property. 11 U.S.C. § 1107(a); (ECF No. 34 at 18–19). PNC claims that its notice is irrelevant and, as the debtor in possession, Rotary Drilling has the power to avoid Fuqua's constitutional lien. (ECF No. 34 at 19–20). PNC's argument has merit. Rotary Drilling, as debtor in possession, has invoked § 544 and filed a claim objection questioning the validity of Fuqua's constitutional lien. (*See generally* ECF No. 224). The Court incorporated this claim objection into this adversary proceeding on December 19, 2016.

In *McEvoy v. Ron Watkins, Inc.*, a contractor sought to assert a constitutional lien against an apartment complex that declared bankruptcy. 105 B.R. 362, 363 (N.D. Tex. 1987). The court held that, under the plain text of § 544(a), actual notice is irrelevant because the trustee may avoid the same encumbrances as a bona fide purchaser "without regard to any knowledge of the trustee or any creditor." 105 B.R. at 364; 11 U.S.C. § 544(a). Even if state law would provide a

different outcome, the language of the Bankruptcy Code controls in a bankruptcy proceeding. *McEvoy,* 105 B.R. at 364. However, the court also stated that § 544 is silent on the issue of constructive notice, and so a creditor who satisfies the state law requirements for constructive notice may file a valid claim to a lien. *Id*. at 365.

This Court adopted the *McEvoy* holding in prior cases. *See, e.g.*, *In re Santoyo*, 540 B.R. 284, 290 (Bankr. S.D. Tex. 2015). Accordingly, the actual notice Fuqua claims existed supporting its constitutional lien is irrelevant. In order to have a valid constitutional lien under the Bankruptcy Code's strong arm clause, Fuqua must have provided constructive notice.

If Rotary Drilling prevails in its avoidance action, Fuqua's constitutional lien would be "preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551. However, neither Rotary Drilling nor Fuqua have fully litigated the lien avoidance question. The avoidance issue between Rotary Drilling and Fuqua will likely require the Court to revisit the arguments examined earlier regarding whether Fuqua had satisfied the requirements of filing its affidavit within the time required after indebtedness had accrued. Furthermore, if the lien is avoided, neither PNC nor Rotary Drilling have litigated whether the constitutional lien would be "preserved for the benefit of the estate." As a result, Fuqua's motion for summary judgment regarding a constitutional lien is also denied.

### Conclusion

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **October 27, 2017.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE